Good morning, Your Honor. Your Honor, it's Donald Stevenson representing Appellant Ohio University, and my voice gets too soft. Let me know. It is a problem I sometimes have. This case involves an appeal of an adverse summary judgment motion that involves a case in which the state of Ohio had originally set up a medical school in Athens, Georgia, which lies in Appalachia, because of a perceived need for more doctors for the people of Ohio. And as part of the authorizing legislation, it required that at least 80% of out-of-state students be committed to practice medicine in Ohio for at least five years. And students who signed a contract of admissions, like Dr. Hawkins did, that committed them to practice medicine in the state of Ohio for five years had a better chance of being admitted. Dr. Hawkins signed the contract, was admitted, received a subsidized medical education, and then left Ohio. Could you describe how that worked? How did he receive it? How did she receive it? She received it in two ways. First of all, she received it by being admitted and having the opportunity. The critical language here was funds. How did she receive funds, not by being admitted? The critical language can be funds, Your Honor, but it might be more expansive. No, but let's concentrate there. Receive funds. Okay, and that would address our educational benefit argument. That would address our educational benefit argument. The funds were received, but they were received by Ohio University from the state of Ohio and were expended on behalf of Dr. Hawkins. And so... Were they earmarked for her? They were earmarked for all medical students, and she was one of those medical students. It was understood from the very beginning that there was going to be a subsidized education, and how do you apportion a portion of a building, the electricity, it was training. But can we say she received the funds? It sounds like Ohio University received the funds. That's right. Well, that's what the statute says. The statute says received as an educational benefit. What's that? The statute says received as an educational benefit, but it doesn't say received by the debtor or by the student. And so the legislation is not narrowly tailored to say that it has to be received by the student. I think that in looking at the congressional scheme, that furtherance of the idea of keeping the doors of colleges open to adept students, that you can interpret it quite reasonably that if funds are received on behalf of a student... Well, how much was received on her behalf? On her behalf was received $84,000 approximately. How'd you arrive at that figure? That was calculated by Darrell Fortner, Wayne Fortner, who is in the administration. He presents a report every year to the chancellor. The report that's in the record is at page 149, and an exhibit to it lists all the subsidies, four-year subsidies received by students by year of graduation. In her year of graduation, this is on page 151 of the record, she received $84,000 as a direct subsidy for a medical education. It also shows that that year she received approximately between $9,000 and $10,000 in clinical subsidies. Was that $84,000 for the whole four-year course of study? That's correct. Not on a per-year basis? That's not on a per-year, and that's why when we were looking at whether this might be a penalty or as applied, it obviously is not a penalty as conceived because it's simply the cost of educating a replacement doctor, but maybe in application it's unfair. And so we, in an exhibit to our opening brief, calculated what the imputed interest would be because she was sued for approximately $94,000. So was she told when she signed that agreement that she was going to have to pay, if she breached it, she was going to have to pay $84,000? No, she wasn't, and in fact, it wasn't contemplated that she would pay the cost of her subsidy. It was contemplated that she would pay the cost of a replacement doctor. Is that what the $84,000 represents? No. $84,000 represents what she was, the subsidies she received, a portion of the subsidy. She actually, if the university had wanted to exact the maximum penny based on the contract of admission, it would have sued on the clinical subsidy and the other subsidies as well. And by looking at page 151, you can see that the clinical subsidy was between $9,000 and $10,000 a year. They could have sued her for an additional, at a minimum, at least $36,000. Well, look at the, I mean, don't get away from the statute because that really governs. And if she has to give, if she's going to have to repay funds received, how does that relate to the cost of educating a student today? Well, the funds received portion of it is when it talks about as an educational benefit. Can you speak up? I can't hear you. Yeah, I'm sorry, Your Honor. The first part refers to, I mean, the funds received by is the portion of the statute that talks about educational benefit. But there's also, the first part says on obligation to repay a loan. That don't sound like a loan to me. Well? You know, loans are a very technical term, and I don't think you've got much of a case on loans. So if you drop the educational benefit, you don't have a case. I'd like to cite a case, leading case, on the Renshaw case, which found that there weren't a loan. And it says, to constitute a loan, there must be a contract whereby one party transfers a defined quantity of money, goods, or services to another, and the other party agrees to pay for the sum or items transferred at a later date. You see, the problem, I understand you're arguing about a loan. If they had said, if Ohio had said, look, we will give you a half tuition benefit if you promise to practice in Ohio for five years. And then she goes to medical school and then just leaves and doesn't stay in Ohio. Now, then if they said, okay, now you owe us that half tuition, because we offered it to you, and that would, I don't think anybody would doubt that that was a loan. But what you're asking her to pay back isn't what she got, it's what it costs to educate somebody else now. Right. What she got was an education that's worth millions. Right. What Ohio University was... And certainly the intent of the statute and everything else is frustrated by what happened. I agree with that, but we're stuck with, as Judge Noonan says, we've got the language of the statute. When you have services, how do you estimate what the services are going to be worth? If you go back to... Well, that's easy. You started earlier in your argument saying, well, you know, there's a certain overhead, there are costs of buildings, electricity. Somebody can do that accounting and say, here's the benefit we conferred on you, now pay it. But that's not what they're saying. Well, this is obviously a case of first impression. All of the cases that I read fall or rise on whether or not there was a contract entered into before the student entered in and received the benefit conferred, which in this case was services. And that contract is here. At that point, the cases all say, except for a few narrow ones that are disapproved in all the circuit cases, that you look at the form and the substance and you go to the substance first over the form. And we have an unusual situation that doesn't fit into the standard situation because it's a service contract, but it's one in which the benefit is in the form of a subsidized education. It's a novel situation. But, and so it's one that's very well adapted to having a reasonable liquidated damages clause, where you can set it. If you go back and look at Mr. Weinfortner's report, they don't know at the beginning of the year when people come in what the subsidy is going to be. His report will show footnotes showing that he adjusted it because money is appropriated throughout the school year. So there's no way to have a some certain in advance. It would fail the test of some of the things. Now they were thinking in terms of the subsidy, the cost of educating a doctor. This is a rational, reasonable way to set damages. It certainly is, but the problem is we're dealing with a statute and we're not trying to decide what's a reasonable requirement from somebody. Either you've got to change the statute, and I'm sure universities are able to lobby with Congress to change it, or you've got to change your contract. And the fact that you now have a statute that doesn't quite fit and the contract doesn't quite fit is your problem. Well, it's the university's problem. It's also respectfully your problem because you look at the statutory scheme and interpret it in terms of congressional intent and try to realize what Congress intended. And I think that this is the type of program that Congress intended to protect. But talking in terms of changing the statute, that is an excellent point because we have an exemption scheme in 523A. I've even forgotten how many, 20 or so. And this is the only one now. At the time I wrote my brief, there were two hardship exceptions. One was in 815 for domestic non-support obligations. That was eliminated in the recent amendments. This is the only exception that has a hardship exception. Congress, since 1978, when it enacted it, has constantly expanded this, expanded this exception. And because the congressional intent is that you are supposed to interpret student loan broadly, it has given an out for the students so that would enable the statute to still advance the importance of a fresh start. But it gives a hardship exception so that this is the one single exception where by the constant expanding of the statute, the student loan exception, that they are instructing the courts to interpret it broadly. And this, again, is the first case that I can find where there was an agreement executed in advance. You do have a contract for services, which the student agrees to pay at a later time. And because it's service, the medical education, they don't know exactly how much it's going to be. And their damages are a replacement doctor. They set the price for a replacement doctor. But at no time has this ever been a draconian penalty on anyone. It can be interpreted, I don't believe, as... I don't think the alternatives, I saw a little reflection of this in the briefs, but the argument about whether it's a penalty or repayment of a loan seems to me to be a kind of a false division because it may be not a penalty. It may be a perfectly good liquidated damages clause, but that doesn't make it a repayment of a loan. But it does solve one of the issues that was raised by the appellate panel. That's why we did every... We showed why it was reasonable. But the... One thing that troubled the panel was, you know, quantifying it. The panel felt that it was a penalty because it wasn't quantified. It also said, what is the benefit to Dr. Hawkins, the very issue that you're raising? Usually it's money. In this case, it wasn't money. It was a subsidized education, but it was services. It was a medical education. And we have the agreement in advance. And the issue before this Court is whether it was adequately quantified by this agreement. And certainly, it was. It said, you're going to receive these services. You're going to receive training. And we'll set a reasonable repayment. You'll either pay us with services, which we really want, or you'll repay us with the cost of paying for your replacement, or at least our best estimate of what it is. And I would like to reserve a little bit of time to address any comments. That's fine. Good morning, Your Honors. My name is Larry Cox. I represent Dr. Hawkins. We have analyzed this contract as a service contract. I would note that the Court was very interested in whether or not there were alternatives and whether or not a some certain could have been determined. I would draw the Court's attention to Section 3337.10, which is in the record, which provides that the Board of Trustees sets the tuition for the medical college. The result is this. If the school sets the tuition level, it knows in advance what will be the amount of the subsidy. It could have calculated that subsidy. Now, it is true that they might not have been able to calculate it for year two and three of a medical education. On the other hand, within the credit industry, open-end lending permits the notion that you will advance a sum up to a certain sum. So had they wished to have made a sum and held the doctor accountable, they could have done that, but they didn't. Moreover, in this particular case, there was another alternative. In this particular, in the instance of Henry Fresh, or I'm not sure the pronunciation, F-R-E-C-H. I'm going to say Fresh. They had a reciprocal agreement dealing with out-of-state students and getting people to come back into the state. And in that particular case, the school had them sign an agreement that there would be a partial reduction in the amount or forgiveness or a full forgiveness in advance if they served. This was not done. It has been our position from the outset that this statute does not create a student loan program, nor does it authorize a student loan program, nor is it intended to authorize the recovery of a subsidy. It is a statement of policy. And it is important to note that this is different from the United States Department of Health and Human Services versus Smith in which scholarship grants were provided as a means to bring physicians into areas where there was, where physicians were underrepresented or not present and provide services to a rural disadvantaged population. What they seek is a subsidized portion of our education. Unfortunately, although there were means to do it, none of them were employed. I've already drawn the Court's attention to the Physician Shortage Area Scholarship Program. That was a program that would have allowed them to accomplish the policy end that they wanted without doing what they did. The law on this point is rather simple, and I think clear. Mr. Stevenson has fairly quoted to the Court the fact that a contract is required, that in addition to the contract, there must be a contemporaneous transfer and acknowledgement of responsibility to repay the sums advanced. Nothing in this record reflects that sort of behavior or business plan. Additionally, in taking a look at the policy... I consider you for admission under sort of favorable circumstances if you agree to serve five years or four or five years of practice in Ohio. What did it say happens if you don't? They said, let me quote it for the... In the agreement at the time of the agreement. And it is in the record at page 80, and it said the remedy is the total then existing subsidized cost at the time of the breach of the College of Osteopathic Medicine to provide medical education to one medical student to be determined by accepted accounting methods by the college. In point of fact, it is not the cost of Dr. Hawkins' education and those subsidized costs. It is a subsidized cost at a future date. It furthers the analysis to note that clearly with the remedy that they crafted, there could only be liquidated damages. There were other remedies. I would note that the policy of 523A8 is to protect the source of the funds. I suppose in a larger sense one could argue, well, counsel, you're protecting the public fisc. That is not the purpose of 523A8. It is to make sure that the funds that are advanced to the students, and I would draw the court's attention to Rosen and Oregon case at the trial court level at page 938 in which the court says that the purpose of 523A8 is to preserve the solvency of the student loan program so funds will be available for future students. In this particular case, we're not even close to that. The contract of service is a recovery of a cost for a subsidy of some future student to replace the student who failed to serve. This is not a circumstance in which the doctor got a free education. By the evidence presented in the Ohio action, it was clear that on a letter directed to Ohio University, Dr. Hawkins had incurred at that time, 2003, $98,721.72. She is paying the HEAL loans and consolidated loans that resulted from the cost of her education. I would draw the court's attention to Ohio v. Smith, not necessarily for any acid test, but for this fact. In that particular case, Mr. Smith said that he signed it because he intended, he wanted to improve his chances of getting into medical school. That's one of the reasons he stated. I would offer it to the court as emblematic of the notion that it is not unlike the issue of credit life and disability insurance in connection with a loan. It is the crisis of the moment. If I sign for the insurance, am I more likely to get the loan? And in this particular case, Dr. Hawkins, I am sure, felt that crisis. My point is that at that time, she then went on to be admitted to pay for her education. I would, it is not in the record, but there were reasons. This is not simply a willful bleach, and I can't fairly argue that to this court. I would say that when one considers the purpose for 5.3A8, when one considers the requirements that have been universally affirmed, I would note that in the Commissioner of IRS v. Valley Morris plan, in a Ninth Circuit case, it was recognized, citing again Rosen, that the term loan is a narrow, given a narrow construction. It is not defined in statute. It is not defined in legislative history. It is defined to some degree by Black's Law Dictionary and by federal common law. Having said that, Your Honor, I will reserve any remaining time I might have for rebuttal. That's it. You've finished your time. Thank you. Your Honor, service contracts are accepted as a basis for being a loan. He mentioned some certain, which doesn't appear to be an issue with the panel, but this is not a case of first impression where the sum certain is determined from an outside source. Henry Mellman, the physical therapist case from New York, gave a tuition, and all the tuition agreement said is no tuition. And so you would, in that agreement, to determine what the sum certain is, you would have to go to an outside source, which would simply be the tuition schedule, to determine what the amount of repayment was. In this case, we have a sum certain. It's determined on an annual basis. See, I don't have a problem with determining the amount to be repaid by reference to an outside source, but that outside source, I would think, under the statute, would have to be determining what her educational benefit had been, what the ultimate subsidy to her had been. It's, in fact, less than her educational subsidy, which would have been about $120,000 when all subsidies are taken into account. The tuition, by the way, is not set for the full amount of the education. That's usually the case. There is going to be a subsidy, and so it would be difficult for them to give some kind of a tuition aid. This is just a unique situation, but loan, I don't believe, is to be interpreted narrowly. You mentioned other courts. Are you familiar with Boston University against Meder? Boston University against Meder? Yes, Your Honor. How do you distinguish that? That just has a slightly more narrow version, but it cites Renshaw with approval. But how about the Halving analysis? Well, these cases, and the problem that I'm faced, and Ohio University is faced with all of these cases, is that none of them involve services per se, quantifying a service such as training for medical education. They didn't pay the tuition. They unilaterally didn't pay the tuition. They didn't pay their bill. They didn't pay their student fees. All of those are easily quantified. Here we have something that falls within the Renshaw definition. She's being provided with services, and so you're going to be the first court to evaluate whether the almighty dollar rules, and everything has to be narrowly construed in terms of dollars, or whether the educational purpose that Congress wants you to put the student loan exception to can cover this situation, where it is quantified, quantified by saying it's for services. It's also quantified in setting the amount that's going to be paid back. I know this is a tough case, but it is one which fits clearly within the congressional purpose. This is the type of program that Congress wants to protect, and it serves an even more important purpose, perhaps, in protecting the people of Ohio. When we look at loan, we just have to look. There's an agreement at the beginning, and we see that agreement at the beginning, and we have all the terms that are required, but it's a little bit different, and it's going to be up to you to determine whether you make that leap or not, but it's not a great step. It's a small one. Thank you. Thank you. The matter will be submitted. Thank you. That's it.
judges: Canby, Noonan, Paez